J-S01002-25          2025 PA Super 102

|  |  |  |
|---|---|---|
| IN RE: T.L.H., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|  | : |  |
| APPEAL OF: T.L.H., SR., FATHER | : |  |
|  | : | No. 1474 MDA 2024 |

Appeal from the Decree Entered September 6, 2024
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
88919

BEFORE:   NICHOLS, J., KING, J., and STEVENS, P.J.E.[*]

OPINION BY NICHOLS, J.:                              **FILED MAY 13, 2025**

Appellant T.L.H., Sr. (Father), appeals from a decree involuntarily terminating his parental rights to T.L.H., Jr. (Child), a minor, claiming that the trial court failed to credit Father for his efforts to maintain a relationship with Child during his incarceration and his commitment to reunification with Child upon his release, to consider alternative remedies to termination of parental rights, and in concluding that termination was in Child's best interests.  Child was two years, ten months old at the date of the termination hearing. We reverse.

### Facts

Child was born prematurely at thirty-five weeks in October 2021, tested positive for amphetamines, and was placed in the NICU.  N.T., 9/6/24, at 44.

_____

[*] Former Justice specially assigned to the Superior Court.

Father acknowledged paternity of Child shortly after birth, and DNA testing later confirmed that Father was the biological father of Child. *Id.* at 48. From birth until Child was approximately nine months old, Father and Child lived together "every single day." *Id.* at 22. Father acknowledged that he used methamphetamines from 2013 until 2017, at which time he became sober upon being sentenced to prison and enrolled in a boot camp program. *Id.* at 35. When asked about his "choice" to raise Child with Child's biological mother, N.L.S. (Mother), even though Mother was using methamphetamines, Father testified that, "I didn't know she was using. [T]he first time I didn't know. I didn't know. People can hide things pretty well[,]" and further explained that his current support network consisted of individuals who do not use drugs at all. *Id.* at 35-36.

In December 2021, Berks County Children and Youth Services (Agency) opened an in-home services case to support Mother and Child, and on February 25, 2022 Agency held a family group decision making (FGDM) conference, at which Father was present, "to develop a plan of support for Mother and Child if Mother would relapse." R.R. at 114a (Ex. 6, hearing officer's May 9, 2023 findings of fact, adopted by the trial court on May 13, 2023);[1] *see also* N.T., 9/6/24, at 44-45.[2] "[T]he case was closed on July 8,

_____

[1] We may cite to the reproduced record for the parties' convenience.

[2] Specifically, Lauren Howard, an Agency caseworker, testified that during the FGDM conference Mother and Father "identified supports who would help with caregiving and supervision of [Child.]" N.T., 9/6/24, at 44.

2022, because they were complying with services in the family group plan." N.T., 9/6/24, at 44.

On July 19, 2022, however, Agency received a report indicating that Mother had been recently hospitalized for drug use. *See* N.T., 9/6/24, at 45. Upon Agency's investigation after this report, Mother admitted to her continued use of methamphetamines. *Id.* Subsequently, on July 22, 2022, Agency filed a petition for emergency custody of Child because of Mother's drug use and because Mother had left Child with individuals not listed on the FGDM plan. *Id.* On that same date, Father was taken into custody for a parole violation. *Id.* at 22, 45. The trial court granted Agency emergency custody of Child and Agency placed Child in foster care with C.H. (Foster Mother) and J.W. (collectively, Foster Parents); Child has remained in the care of Foster Parents for the entirety of this dependency matter. *Id.* at 54-55, 63.

On August 10, 2022, the trial court adjudicated Child dependent and directed Father to, among other things, participate in parenting education, obtain a mental health evaluation and a drug and alcohol evaluation, and establish and maintain stable and appropriate housing and income, in order to reunify with Child. *Id.* at 45-46; *see also* R.R. at 96a-98a (Ex. 4, Order of Adjudication, CP-06-DP-122-2022, 8/10/22). The trial court ordered that "[v]isitation between Father and Child shall begin after Father's release from incarceration, which is expected to occur in the near future, and shall occur two [] times per week for a two [] hour duration[]." *See, e.g.,* R.R. at 97a.

Further, Susan Quirits, Esq., appeared on behalf of Father at the adjudication hearing.[3]  *See* R.R. at 96a.

The trial court entered orders after permanency review hearings for Child's dependency case on December 13, 2022, May 9, 2023, October 17, 2023, and March 5, 2024.  *See* R.R. at 99a-149a (Ex. 5-8, dependency orders, 12/15/22, 5/10/23, 10/23/23, and 3/6/24 (collectively, Dependency Orders)). Father, who was incarcerated at the time, did not appear at these hearings. However, Attorney Quirits, Father's court-appointed counsel, appeared telephonically on behalf of Father at the first three dependency hearings and in person at the last hearing on March 5, 2024.[4]  R.R. at 99a, 109a, 123a, 140a.  On March 5, 2024, the trial court vacated Attorney Quirits's appointment as Father's counsel; the record does not reflect the reason for the trial court's decision to vacate this appointment or why the trial court did

_____

[3] In letters dated November 7, 2022; March 16, 2023; and August 14, 2023, Agency informed Father that if he wished to have an attorney represent him at upcoming permanency hearings that he should complete an affidavit of destitution and submit this to Child's caseworker.  *See* R.R. at 150a (Ex. 9, correspondence from Agency to Father), 158a (Ex. 11, correspondence between Father and Agency), and 163a (Ex. 12, correspondence between Father and Agency).

[4] The record does not indicate that Attorney Quirits ever requested nor if the trial court ever ordered the Dauphin County Prison, the Department of Corrections, or the relevant prison warden or superintendent to arrange for Father to participate in these hearings while incarcerated, either in person, telephonically, or by videoconferencing.

not appoint new counsel to represent Father.[5]  **See** R.R. at 142a.  Father subsequently testified that he never received a copy of the March 5, 2024 dependency order.  **See** N.T., 9/6/24, at 24.  Father also testified that Attorney Quirits only communicated with him twice:  the first time "when [he] first got incarcerated[]" in July of 2022; the second time after Father learned that Agency would move to terminate his parental rights and wrote a letter to the trial court which was forwarded to Attorney Quirits, to which Attorney Quirits responded by writing to Father that "the only thing getting [Child] back will do is traumatize him, and there's nothing we can do about it."  **Id.** at 19-20.

Additionally, the Dependency Orders note that, due to Father's incarceration, he "has not had access to services."  **See, e.g.**, R.R. at 100a (Ex. 5, Dependency Order, 12/15/22).  The Dependency Orders  also provide that "[u]pon Father's release from incarceration, visitation between Father and Child shall be fully and professionally supervised and occur two [] times per week for a two [] hour duration[;]" and that, "[u]pon Father's release from incarceration, he shall immediately contact [Agency] to develop a plan of services and visitation."  **Id.** at 101a (some formatting altered).

---

[5] **See** 42 Pa.C.S. § 6337 (providing that "a party is entitled to representation by legal counsel at all stages of any proceeding under this chapter and if he is without financial resources or otherwise unable to employ counsel to have the court provide counsel for him").

With regard to Agency's plan to reunify Father with Child, in letters dated November 7, 2022, through to November 30, 2023, Agency advised Father that

> it is your responsibility to establish/maintain a relationship with your child. This could be through letters, cards, audiotapes, or gifts to your child regularly and on special occasions. If possible make contact with your child's caseworker to obtain updates on your child's progress in placement. Additionally, you can also take steps to better prepare yourself for the challenges of raising a child once you are released. Enroll in parenting or other classes to address some of the problems associated with your incarceration. Most correctional facilities offer anger management, parenting, and drug/alcohol classes, among others, to help you overcome obstacles that prevent you from being a better parent to your child.

*Id.* at 151a (Nov. 14, 2022 correspondence from Agency to Father); *see also* R.R. at 156a-57a, 159a (Ex. 11, correspondence between Father and Agency); 161a-62a, 164a-65a (Ex. 12, correspondence between Father and Agency).

Father kept Agency informed of his sentence of incarceration. *See id.* at 166a (Ex. 12). While incarcerated at SCI Phoenix, Father corresponded by letter with Agency caseworkers on April 10, 2024; May 7, 2024; May 8, 2024; and May 13, 2024. Specifically, Father explained in his May 7, 2024 letter that he had already requested parenting classes but was informed that this service was not available to him. *See id.* at 170a (Ex. 16, Father's May 7, 2024 correspondence to Agency).

With regard to visitation between Father and Child, Lauren Howard, the Agency's adoption caseworker, testified that the Dependency Orders directed that supervised visits were to start after Father's release from incarceration

and did not provide for telephone contact between Father and Child. *See* N.T., 9/6/24, at 52.[6] Ms. Howard was not aware of whether the institutions where Father had been incarcerated offered any of the services that Father was required to complete in the Dependency Orders. *Id.* at 50. Father testified that he had weekly video calls with Child on Sundays during Mother's supervised visits with Child, and this was "pretty much all I could do." *Id.* at 17, 21; *see also id.* at 27-28; R.R. at 310a-12a (Ex. 18, Father's inmate call log).[7] Father explained that Child had not been permitted to come in person to the prison to see him. *See* N.T., 9/6/24, at 21. Father testified that his last contact with Child occurred at the end of February of 2024, which was shortly before Mother consented to relinquish her parental rights to Child. *See id.* at 30.

---

[6] Specifically, Ms. Howard testified as follows:

> Q: Was there ever mention in any of the court orders of phone contact [between Father and Child]?
> A: No.
> Q: So, to your knowledge, do you know anyone at the Agency that would have permitted that contact?
> A: No.

N.T., 9/6/24, at 52 (some formatting altered).

[7] We note that the three pages of Father's inmate call log included in Exhibit 18 are numbered 1, 3, and 5, indicating that there may have been additional pages 2 and 4 that were not included in the certified record. Father's counsel at the TPR hearing described this document as "a five-page exhibit." *See* N.T., 9/6/24, at 27.

After Father's last video visit with Child, as facilitated by Mother, at the end of February 2024, Father wrote a letter to Foster Mother about Child and they spoke by telephone on May 28, 2024. During that call, Foster Mother informed Father that he could no longer have video visits or calls with Child due to a court order, and explained that Ms. Howard had informed her that the only contact that Father could have with Child was pictures from Foster Parents. *Id.* at 23-24, 26; *see also* R.R. at 309a (Ex. 18, Father's correspondence to his new counsel, Joseph T. Bambrick, Esq.). Father sent Child a card with a monster truck on it in January of 2024, and he sent another card with a picture of a monster truck and Captain America to Child on June 24, 2024. *See id.* Father testified that he did not send pictures to Child previously because he did not have money to buy pictures. *See* N.T., 9/6/24, at 20.

With regard to the services Father was required to complete in the Dependency Orders, on May 9, 2023, Father wrote to Katherine Rosario, an Agency caseworker, asking her to meet him "to talk about [Child] and what I got to do to start the process of getting him back once I am released from prison." *See* R.R. at 160a (Ex. 11). In response, Ms. Rosario met with Father, and Father testified that at this meeting she informed him that, "as long as [you do] what the Court Order said, when you are released from prison, you . . . get your evaluations for drug and alcohol, and get into parenting class, and everything will just slowly – you'll get your visits back, and it will come back, back, back." N.T., 9/6/24, at 14. Father testified that he understood

from the Dependency Orders that his psychological evaluation could be completed following his release from prison, that is, "everything in the Court Order said, when you get released from prison, to do it when I got released from prison. It didn't say, do it while you're in prison[,]" and that "[i]t says in the Court Order, specifically, when Father's released from incarceration. It don't say, get it done while you are in there. It says, when I'm released." ***Id.*** at 31-32.

Father testified that because he was not classified as a parent in the prison's computer system, he was informed by prison staff that he could not participate in parenting classes. ***See id.*** at 7-9. Specifically, even after Father explained to a staff member that he had a DNA test confirming that he is Child's father, the staff member was not able to enroll Father in the parenting education program in the prison's computer system. ***See id.*** at 8-9. Further, Father was not able to obtain a drug and alcohol evaluation while he was incarcerated, nor a psychological evaluation which he requested on July 29, 2024. ***See id.*** at 9, 24-25, 31; R.R. at 306a (Ex. 18, inmates' request to staff member form). He explained that he was unable to receive these services because he had been recommitted as a parole-violator and because there was a long waiting list for the programs and services. ***See id.***[8]

_____

[8] We note that Father requested his psychological evaluation on July 29, 2024, after Agency filed the TPR petition on May 7, 2024, and received a written response from prison staff that the prison system does "not provide psych evaluations for this purpose." R.R. at 306a (Ex. 18, inmate's request form);
*(Footnote Continued Next Page)*

On February 27, 2024, Father wrote to Ms. Rosario informing her about the sentence he received on that same date in his criminal matter and stating that, "I just can't wait to get home and do everything in my power to be with [Child] and resolve all this." R.R. at 166a (Ex. 13, Father's correspondence to the Agency).

On April 10, 2024, after receiving an introduction letter from Ms. Howard, Father wrote back that he had not received the most recent dependency order and requested a copy of the same. *See id.* at 168a (Ex. 15, correspondence between Father and the Agency). Father also asked Ms. Howard why Child's case was now considered an adoption case as "my last caseworker told me as long as I did as I'm supposed to according to the court order I didn't have to worry about adoption. My goals are to come home in December and start the process of getting [Child] back." *Id.*

Ms. Howard wrote to Father on April 24, 2024, explaining that since "[t]here has been no progress with the case" and Child had been in foster care over fifteen months that Agency was required to petition to terminate Father's parental rights and would file this petition in May of 2024. *Id.* at 169a.

On May 7, 2024, Father wrote to Ms. Howard requesting that she come visit him "as soon as possible so I can ask questions and get the answers right

_____

*see also id.*; N.T., 9/6/24, at 24-25, 31. We note that in deciding whether a petitioner has established grounds of termination of parental rights under 23 Pa.C.S. §§ 2511(a)(1), (6), or (8), the trial court "shall not consider any efforts by the parent to remedy the conditions described [in the petition to terminate parental rights] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b).

away not a month later." *Id.* at 170a (Ex. 16, correspondence between Father and Agency). Further, Father responded to Agency's conclusion that he had made no progress with Child's case by explaining that "no services are available for me here to do that. I wrote requests for parenting classes and they don't have anything like that here. I'm in a back on track program that's the only recommended program they will give me." *Id.*

On May 8, 2024, Father again wrote to Ms. Howard, stating that he "would like to be present for the hearing involving [Child]" and "I don't understand why this has to happen now when every court order I have received says nothing about adoption it all says once Father is released from prison I got to do a number of things to get my son back and that's it." R.R. at 171a-72a (Ex. 16, Father's correspondence to Agency).

On May 9, 2024, Agency served Father with its petition to terminate his parental rights to Child (TPR petition). *See* Proof of Service, 5/9/24. Further, on May 7, 2024, Agency filed a petition to confirm Mother's consent to adoption, along with Mother's affidavit of consent to the adoption of Child, which Mother executed on March 5, 2024. *See* Pet. to Confirm Consent to Adoption, 5/7/24.

On May 13, 2024, Father wrote to Ms. Howard to ask for a meeting and informed her that he had requested "an Appointed Attorney." *Id.* at 173a. In this letter Father also reiterated that he had not been able to access any education programs or classes in prison and that he did not wish to give up his rights to Child. *Id.*

- 11 -

Ms. Howard met with Father on May 22, 2024 and reviewed Agency's TPR petition with him, and testified that Father responded to this information by "look[ing] at the paperwork and, um, used some curse words towards me, and got up, and left the room." *See* N.T., 9/6/24, at 51.

On September 6, 2024, the trial court held a hearing on Agency's TPR petition.[9] At the time of this hearing, as previously noted, Child was two years and ten months old. Child was represented by Ashley Esposito, Esq., serving both as Child's Guardian *ad Litem* (GAL) and legal counsel,[10] and Father was represented Attorney Bambrick, who entered his appearance on June 3, 2024. *See* N.T., 9/6/24, at 5.[11]

Father and Ms. Howard were the only witnesses who testified at the TPR petition hearing. Father testified that he had been incarcerated since July of

_____

[9] The Honorable Tina M. Boyd presided over Child's dependency case, including the emergency shelter care petition and adjudication of dependency, as well as all permanency review hearings and dependency orders. The Honorable Jill M. Scheidt presided over the TPR hearing.

[10] On May 13, 2024, the trial court appointed Attorney Esposito, who was already serving as Child's GAL, as Child's legal counsel for Father's TPR proceedings, noting that Attorney Esposito "has no conflict serving as both Legal Counsel and Guardian *ad Litem*." *See* Trial Ct. Order, 5/13/24 (some formatting altered).

[11] The record does not contain an order appointing Attorney Bambrick as Father's counsel. In reference to Attorney Bambrick, the trial court opinion states that "Father obtained new counsel, Joseph T. Bambrick, Esquire[,]" and the trial court docket reflects that Attorney Bambrick entered his appearance on behalf of Father on June 3, 2024. We gather from these references that Father independently retained Attorney Bambrick after the trial court vacated the appointment of Attorney Quirits.

2022 and that his minimum term of sentence ended in December 2024 and the maximum term ended in November 2025. **See** N.T., 9/6/24, at 6-7,[12] 22, 37. Father testified that he was currently serving a sentence for committing "criminal mischief" in March of 2022, a violation of the terms of his parole from a sentence for possession of a firearm and receiving stolen property. **Id.** at 21-22, 34. Father testified that he been incarcerated four times prior to Child's birth, for periods of forty-five days, ninety days, thirteen months, and eighteen months, and that his first sentence in 2013 had been for possession of methamphetamine. **Id.** at 34-35. Father had been incarcerated in Dauphin County Prison on July 22, 2022, transferred to SCI Smithfield on March 1, 2024 after his sentencing date, and was transferred to SCI Phoenix on April 7, 2024. **See** R.R. at 186a (Ex. 17, Father's criminal docket sheets); N.T., 9/6/24, at 33.

Father testified that, based on information from his parole officer, he expected to be released in December of 2024 and intended to reside with his brother, M.A., in an apartment in Morgantown, Pennsylvania; that he was a certified welder and had a job prospect at a company that processed titanium; and that Child could live with Father at M.A.'s apartment. **See** N.T., 9/6/24, at 7, 28-29. Father testified that M.A. had committed to help him get back on his feet and, with regard to "rent and expenses[,]" that his brother

_____

[12] Father testified that, "I seen parole two weeks ago, and he said, you will be out in – [December] . . . I'd be out in my minimum. I got nine months as of March 3rd [when Father was sentenced]. I got nine months in [as of December 2024]." N.T., 9/6/24, at 6-7.

- 13 -

"wouldn't expect me to pay anything until I was able to pay something." *Id.* at 38.

On September 6, 2024, the trial court issued a decree terminating Father's parental rights to Child pursuant to 23 Pa.C.S. §§ 2511(a)(1), (a)(2), and (b).[13] *See* Decree, 9/6/24, at 1-2 (unpaginated). Father filed a timely notice of appeal, and both Father and the trial court complied with Pa.R.A.P. 1925.

On appeal, Father raises the following issues:

1. Did the trial court err and abuse its discretion in granting [the Agency's TPR] petition under 23 Pa.C.S. § 2511, when [] Father made efforts to maintain a relationship with [] Child during his incarceration and demonstrated a commitment to reunification upon his release?

2. Did the trial court fail to adequately consider alternative remedies to the termination of parental rights, such as a transitional reunification plan, thereby contravening Pennsylvania's preference for preserving family bonds whenever feasible?

3. Did the trial court err and abuse its discretion in determining that the termination of [] Father's parental rights was in [] Child's best interests under 23 Pa.C.S. § 2511(b), when [] Father maintained contact with [] Child to the extent permitted by his circumstances, and the kinship family's interference further limited his ability to strengthen the parent-child bond?

---

[13] We note that although the trial court terminated Father's rights only under Sections 2511(a)(1) and (2), the trial court also referenced Sections 2511(a)(5) and (a)(8) in its opinion. *See* Trial Ct. Op., at 17-18. Because the instant decree did not reference either Section 2511(a)(5) and (a)(8) as grounds for termination, we do not address these grounds.

Father's Brief at 4 (some formatting altered).[14]

## Standard of Review

In reviewing Father's appeal, we are mindful that "the grounds of termination must be demonstrated by clear and convincing evidence[]" by the party seeking termination, in order to protect both "a parent's substantive due process rights" and fundamental parental rights, "while also ensuring the safety and permanency needs of dependent children." *See In re D.C.D.*, 105 A.3d 662, 676-77 (Pa. 2014) (citation omitted); *see also, In re T.J.J.M.*, 190 A.3d 618, 626 (Pa. Super. 2018) (the party seeking termination bears the burden of proof) (citation omitted); *In re R.I.S.* 36 A.3d 567, 572 (Pa. 2011) (plurality) (same).

The right to "raise one's children has long been recognized as one of our basic civil rights[, and] the complete and irrevocable termination of parental rights is one of the most serious and severe steps a court can take." *Id.* (citations omitted). "Because of this serious impact attending the termination of parental rights, it is important that a judicial decree extinguishing such rights be based solely on competent evidence." *In re Adoption of C.M.*, 255

_____

[14] While Father identified three issues in his statement of questions presented, the argument section of his brief is not divided into three sections. We note that Pa.R.A.P. 2119(a) requires that the argument section of the brief be divided into as many parts as there are questions to be argued and that failure to do so may result in waiver. *Ramalingam v. Keller Williams Realty Grp., Inc.*, 121 A.3d 1034, 1042 (Pa. Super. 2015). As the defect in Appellant's brief does not impede our ability to render meaningful appellate review, we decline to find waiver on this basis. *Id.*

A.3d 343, 358 (Pa. 2021) (citations omitted). In reviewing a termination decree, we "accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but [are] not require[d] to accept the lower court's inferences or conclusions of law." *Id.* "[A]bsent an abuse of discretion or error of law, where the trial court's findings are supported by competent evidence, an appellate court must affirm the trial court even though the record could support the opposite result." *R.I.S.* 36 A.3d at 572. "To the extent an issue raises purely a question of law or statutory interpretation, our standard of review is *de novo* and our scope of review is plenary." *In re K.T.*, 296 A.3d 1085, 1104 (Pa. 2023) (citations omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act,[15] which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*T.J.J.M.*, 190 A.3d at 626-27 (citations omitted). We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm an order terminating parental rights. *Id.*

---

[15] 23 Pa.C.S. §§ 2101-2938.

**Section 2511(a)(1)**

Father first contends that the trial court erred in finding grounds to terminate his parental rights under 23 Pa.C.S. § 2511(a)(1) because, despite his incarceration, he maintained a relationship with Child through video communications and mailed pictures or cards to Child. Father's Brief at 13. Father notes that his attempts to maintain a bond with Child were thwarted after February 2024, when Foster Mother informed him that, upon Agency instruction, he could no longer contact Child by video calls, as describes this as an arbitrary termination of his contact with Child. *Id.* at 13, 17-20. Father argues that he could not have in-person contact with Child unless Agency "agreed and the custodian of the child brought the child to the prison to see him." *See id.* at 16. Father notes that he testified that he expected to be released in December 2024 and had made arrangements to be with Child upon his release, and that upon release he would be ready, willing, and able to care for Child. *Id.* at 17-19.[16]

---

[16] Father's brief states that Father was released from SCI Phoenix on November 5, 2024. Father's Brief at 8. Further, Father's reproduced record includes certifications of programs, including for parenting education, that Father completed after the TPR petition hearing. *See* R.R. at 313a-20a. We note that Father's release date and these program completion certifications were not before the trial court at the TPR petition hearing and therefore are not part of the record for our review and, accordingly, our disposition does not rely on these items. *See* Pa.R.A.P. 1921 (the certified record "shall constitute the record on appeal in all cases"); *see also Eichman v. McKeon*, 824 A.2d 305, 316 (Pa. Super. 2003) ("an appellate court cannot consider anything which is not part of the record" (citation omitted)).

Agency responds that "Father did not complete any of the services ordered at the time of adjudication of Child." ***See*** Agency's Brief at 14, 18-19. While acknowledging Father's position that "he was unable to access services while incarcerated[,]" and not disputing that caseworkers "told him 'not to worry' about completing services," Agency characterizes Father's testimony as "filled with contradictions" and "attempt[s] to place blame anywhere else[]." ***Id.*** at 14-15.[17] Agency notes that Father did not attend Child's permanency review hearings and described him as "wholly noncompliant" with Child's permanency plan and that he demonstrated a "lack of engagement with [Agency] despite the efforts each caseworker made to involve Father in [Child's d]ependency case[.]" ***Id.*** at 19-20.

Section 2511(a)(1) of the Adoption Act provides as follows:

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

---

[17] Agency did not provide any citations to the record to support its argument that Father's evidence or testimony was contradictory or untrue.

We note that Father's position accords with the Dependency Orders, which state that "Father's incarceration has limited Father's access to assessments and any consequential services[,]" Father "has not had access to services[,]" and "[u]pon Father's release from incarceration, he shall immediately contact [Agency] to develop a plan of services and visitation." ***See, e.g.***, R.R. at 99a-102a (Ex. 5, Dependency Order, 12/13/22).

23 Pa.C.S. § 2511(a)(1).

With regard to the grounds for termination in Section 2511(a)(1), "[t]he law does not require a settled purpose of relinquishing a parental claim **and** a refusal or failure to perform parental duties, but one or the other." ***Adoption of C.M.***, 255 A.3d at 364 n.12 (citation omitted and emphasis in original). "Parental duty" is "a positive duty requiring affirmative performance" and a parent must "exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship, or his rights may be forfeited." ***Id.*** at 364 (some formatting altered and citations omitted).

> However, even where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months, the court must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination of parental rights. We have consistently emphasized the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. In this vein, a wealth of Superior Court jurisprudence instructs trial courts deciding Subsection 2511(a)(1) cases to consider the whole history of a given case and "not mechanically apply the six-month statutory provision[,]" although "it is the six months immediately preceding the filing of the petition that is most critical to the analysis."
>
> In further consideration of the totality of circumstances, if competent evidence establishes the statutory criteria under Subsection 2511(a)(1), we then require three lines of inquiry: (1) the parent's explanation for his or her absence; (2) the post-abandonment contact between parent and child, including a parent's efforts to re-establish contact; and (3) consideration of the effect of termination of parental rights on the child pursuant to Subsection 2511(b).

*Id.* at 364-65 (citations omitted and some formatting altered).

> For incarcerated parents,
>
> > a parent's absence or failure to support his or her child due to incarceration is not, in itself, conclusively determinative of the question of parental abandonment. Indeed, incarceration alone is not an explicit basis upon which an involuntary termination may be ordered pursuant to Section 2511 of the [] Adoption Code. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison to continue to pursue a close relationship with the child[.] An incarcerated parent desiring to retain parental rights must exert him- or herself to take and maintain a place of importance in the child's life.
> >
> > *   *   *
> >
> > [T]his Court has never adopted or countenanced a view that incarceration alone . . . represents appropriate and sufficient grounds for the involuntary termination of parental rights. . . . [W]hen a parent uses the opportunities that are available in prison to make sincere efforts to maintain a place of importance in the lives of his or her children, incarceration alone will not serve as grounds for the involuntary termination of his or her parental rights [under Section 2511(a)(1)].

*R.I.S.*, 36 A.3d at 572-74 (citations and footnotes omitted).[18]

_____

[18] We note that *R.I.S.* is a plurality opinion in which six members of our Supreme Court reversed this Court and sustained the trial court's denial of a petition to terminate parental rights. Former Justice McCaffery authored the lead opinion, joined by then-Chief Justice Castille and then-Justice Eakin. Then-Justices Saylor, Baer, and Todd each authored concurring opinions, while then-Justice Orie Melvin authored a dissenting opinion. *R.I.S.*, 36 A.3d at 575.

Instructive to our review here, then-Justice Baer in his concurrence, joined by then-Chief Justice Castille and then-Justices Todd and Saylor, stated that

> [t]here is no question that the fact of incarceration, regardless of why, is not in and of itself determinative of parental incapacity.

*(Footnote Continued Next Page)*

The incarcerated parent in *R.I.S.* had an approximate future release date in two years and three months at minimum, and six years and three months at maximum, at the time of the termination hearing, and had been the primary caregiver for the children before his incarceration. *Id.* at 569, 571. The *R.I.S.* petitioner conceded that "there was nothing that [the parent] didn't do or that there wasn't some satisfactory reason for his not being able to do it." *Id.* at 571. The trial court in *R.I.S.* "determined that the length of [] sentence was not so great as to foreclose the possibility of the successful maintenance of the parent-child relationship" and, relying in part on this finding, denied the termination petition. *Id.* at 571, 574. A divided three-member panel of this Court reversed the trial court's order; on appeal, our

---

> Moreover, the fact of incarceration during an ongoing dependency action will not disqualify a parent from resuming parental responsibility so long as the parent will be released quickly enough to permit the court to provide the child with timely permanency upon reunification. If however, the length of parent's incarceration will preclude the court from unifying the (former) prisoner with the child on a timely basis in order to provide the child with the permanent home to which he or she is entitled, then the length of sentence, standing alone, should and does meet the legal criteria for involuntary termination . . . under 23 Pa.C.S. § 2511(a)[.]

*Id.* at 576 (Baer, J., concurring); *see also In re Adoption of S.P.* 47 A.3d 817, 829 (Pa. 2012) (reviewing this concurring opinion in *R.I.S.* and adopting this approach). Stated another way, "[w]hile the mere fact that the parent was incarcerated . . . during . . . a dependency case does not serve as grounds for termination, the length of a parent's incarceration, standing alone, can satisfy the statutory grounds for termination under 23 Pa.C.S. § 2511[.]" *R.I.S.*, 36 A.3d at 576 (Baer, J., concurring).

Supreme Court reinstated the trial court's denial of the termination petition. *Id.* at 574.

After *R.I.S.*, our Supreme Court again reviewed how a parent's incarceration should be treated in the context of termination of parental rights in *In re Adoption of S.P.* In *S.P.*, the parent began serving a five to ten-year sentence prior to the birth of the child. *Adoption of S.P.*, 47 A.3d 817, 819 (Pa. 2012). During his incarceration, the parent had six visits with the child, sent cards and letters to the child and requested the child's artwork; and a social worker opined that the parent "had put substantial efforts into establishing a relationship with [the child], did everything he could do from prison[.]" *Id.* at 823. The termination hearing was held three years into the parent's sentence, when the child, who had special needs, was three years and ten months old. *Id.* at 819. The *S.P.* trial court noted that, "at the time of his incarceration, [the parent] did not have his own housing, employment, or transportation, and had previously been adjudicated delinquent[;]" and further found that

> the parent "had been incapable of providing for [the child] since her birth, and was unable to 'maintain' a relationship with [the child] because one never existed[,]" and concluded that the parent did "not currently have the ability to be such a caregiver, nor is it clear when in the future, if ever, he will be capable of doing so."

*Id.* at 820. The trial court found that the parent "could not provide a date certain when he would be able to parent [the child]," and "that [the child's]

- 22 -

'need for permanence and stability will not be subordinated to a parent's claims of progress or hope for the future.'" *Id.*

In *S.P.*, our Supreme Court reiterated that in considering the effect of a parent's incarceration on the question of abandonment contained in Section 2511(a)(1), the relevant query is "whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child[,]" that is, whether the parent has exercised "reasonable firmness in declining to yield to obstacles[.]" *Id.* at 822 (citing *In re Adoption of McCray*, 331 A.2d 652, 655 (Pa. 1975)).

Here, the trial court acknowledged that "Father's incarceration had limited his access to assessments and any consequential recommended services[,]" and that the Dependency Orders directed that "visitation between Father and Child" shall occur "upon Father's release from incarceration[.]" Trial Ct. Op., 11/6/24, at 8. However, the trial court did not consider the effect of the Dependency Orders on Father's conduct in prison, concluding only that "Father hesitated to complete services or participate meaningfully saying that [the dependency] orders told him he could wait until his release." *Id.* at 19-20. The trial court disparaged Father for "waiting until his release to get a psychological evaluation[]" without identifying why this was unreasonable given that the Dependency Orders contemplated just such a timeline for Father. *Id.* at 24. The trial court found that Father's relationship with Child consisted of Father sending one picture to Child over the course of his incarceration and that Father had video calls with Child "for a few minutes

every week until February 2024." *Id.* at 20. The trial court characterized Father's conduct under the circumstances as "minimal efforts to communicate with [] Child" and concluded that Father's weekly video calls were "insufficient to establish a bond with [] Child." *Id.* The trial court further noted that Father for the most part did not follow Agency's recommendations "that Father maintain a relationship with [] Child through letters, cards, audiotapes or gifts on special occasions[,]" and concluded that Father "could have done more to maintain a relationship with Child [while incarcerated,] such as reaching out to the foster family sooner than three [] months prior to the [TPR] hearing, after the [TPR] petition was filed." *Id.*

The trial court acknowledged that Father corresponded with Agency caseworkers and informed Agency of his efforts to obtain his required assessments and services. *Id.* at 20-21. The trial court found, however, that Father's testimony about his residence and employment prospects upon his expected release from prison in December 2024 lacked corroboration, was "self-serving," and "little more than hope" because Father could not provide "a date certain when he would be able to parent [] Child[.]" *Id.* at 21. The trial court concluded that "Father's expectation [] to start services upon his release[,]" for example, "waiting until his release to get a psychological evaluation[,]" coupled with Father's past criminal conduct which had caused his unavailability to parent Child, was not "sufficient reason to continue to delay [] Child's permanency." *Id.* at 21, 24.

Here, with regard to Section 2511(a)(1), we consider Father's conduct in the six months prior to Agency's service of the TPR petition, that is, December 9, 2023 to May 9, 2024, and whether this conduct demonstrates "a settled purpose to relinquish a parental claim to Child or a refusal or failure to perform parental duties." *See* 23 Pa.C.S. § 2511(a)(1); *C.M.* 255 A.3d at 364 n.12. To avert termination on this ground, Father must have exercised reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. *See Adoption of S.P.*, 47 A.3d at 822. We also review, due to Father's incarcerated status, whether the trial court evaluated how Father "utilized those resources at his [] command while in prison to continue to pursue a close relationship with [Child,]" that is, whether Father made "sincere efforts" and exerted himself "to take and maintain a place of importance in [Child's] life." *R.I.S.*, 36 A.3d at 573 (citations omitted).

On this record, we are constrained to disagree with the trial court's conclusion that Agency met its burden with regard to Section 2511(a)(1). *See C.M.*, 255 A.3d at 358. The record reflects that Father cared for Child from birth to age nine months. *See* N.T., 9/6/24, at 22. During his incarceration Father wrote six letters to Agency caseworkers repeatedly asking what he needed to do to resume parental duties to Child and reporting on his efforts to comply with his reunification requirements. *See* R.R. at 160a, 166a, 168a, 170a-73a. Agency's plan for Father's reunification with Child – as set forth in the Dependency Orders, communicated to Father in Agency correspondence,

and confirmed by Agency's witness – recognized that Father could not access services in prison, and the orders provided that Father's progress on these services shall commence upon his release from incarceration. **See, e.g.**, **id.** at 101a (Dependency Order, 12/15/22). Despite this grace period for Father's progress toward reunification as set forth in the orders, Father did attempt, albeit unsuccessfully, to access services while in prison. **See** N.T., 9/6/24, at 7-9; **see also** R.R. at 170a, 173a. Therefore, the trial court's conclusion that Father was passive with respect to completing services necessary to resume parental duties is not supported by the record.

Agency recommended that Father maintain a relationship with Child by sending items such as cards or pictures to Child and writing letters to Foster Parents to stay apprised of Child's status. **See, e.g.**, R.R. at 151a. Father instead maintained contact with Child directly through weekly video visits until the end of February 2024.[19] **See** N.T., 9/6/24, at 17, 21, 27-28, 30. Foster Mother informed Father that Agency had instructed her to terminate these video visits because the trial court had not authorized them, and that the only authorized contact Father was to have with Child were pictures from Foster Parents, Father sending cards or pictures to Child, or writing letters to Foster Parents. **See id.** at 23-24, 26; **see also** R.R. at 309a (Ex. 18). The Dependency Orders provided for supervised visitation with Child upon Father's

_____

[19] As stated above, Mother voluntarily consented to terminate her parental rights to Child on March 5, 2024, and therefore no longer had visitation with Child after this date.

release from incarceration, but neither expressly permitted nor prohibited video visits or calls while Father was incarcerated.  ***See, e.g.***, R.R. at 101a (Ex. 5, Dependency Order, 12/13/22).  Agency's interpretation of these orders – that video visits were prohibited while Father remained incarcerated – and Agency's action pursuant to this interpretation limited Father's contact with Child to the exchange of cards and pictures between Father and Foster Parents.  ***See*** Agency's Brief at 19.  We note that Child was aged nine months to two years and seven months during the relevant period.

Agency did not introduce any evidence that cards and pictures are more effective than weekly video visits for Father to maintain a meaningful relationship with Child, where Father's maintenance of such a relationship was a prerequisite to reunification and where reunification was the primary permanency goal in all the dependency orders.  ***See, e.g.***, R.R. at 141a-42a.  As stated above, it is undisputed that Father communicated with Child on a regular basis until Agency cut off this contact.  Following our review, we conclude that the trial court's conclusion that Father barely communicated with Child on a regular basis lacks support in the record.

Finally, with regard to the length of Father's sentence and his residence and potential employment opportunities upon release, the trial court did not specifically discredit Father's testimony that he expected to be released in December 2024 but did, however, describe it as "self-serving."  ***See*** Trial Ct. Op. at 21.  The trial court characterized Father's post-incarceration plans – to live in an apartment with his brother until he earned his own income; to seek

work based on his certification as a welder, for which he had identified a potential employer; and to gradually re-establish in-person contacts with Child with the goal of having Child come live with him full-time, none of which Agency disputed – as "supported by little more than hope[.]" *Id.*

The conditions that led to Child's placement were Mother's relapse into drug use and Father's incarceration. *See* N.T., 9/6/24, at 45. Since Child's placement, Mother voluntarily consented to terminate her parental rights and, accordingly, Child is no longer in danger of being abandoned by Mother due to a drug addiction. *See* Pet. to Confirm Consent to Adoption, 5/7/24, Ex. A. The record therefore reflects that upon Father's release from incarceration both conditions that led to Child's placement would no longer exist.

It is Agency's burden to prove that Father evidenced a settled purpose of relinquishing his parental claim or refused or failed to perform his parental duty by failing to utilize resources or opportunities available to Father in prison. *See* 23 Pa.C.S. § 2511(a)(1); *R.I.S.*, 36 A.3d at 574; *Adoption of S.P.*, 47 A.3d at 822; *see also, T.J.J.M.*, 190 A.3d at 626; *D.C.D.*, 105 A.3d at 676-77. Agency does not dispute and the trial court does not discredit Father's testimony and evidence that he attempted to obtain his drug and alcohol evaluation and parenting education during the six months preceding service of the TPR petition, even though the Dependency Orders permitted Father to commence progress on these tasks upon his release. Agency also does not dispute and the trial court did not discredit that Father attempted to maintain contact with Child, even though the Dependency Orders did not

provide for visitation with Child and Agency did not make efforts to assist Father to have meaningful contact with Child but instead hindered Father's contact with Child. The record reflects that Father utilized the resources at his command while in prison to continue to pursue a meaningful and age-appropriate relationship with Child. **See Adoption of C.M.**, 255 A.3d at 364. As this Court cannot identify the facts in the record relied on by the trial court to find that Agency met its burden of clear and convincing evidence, we therefore conclude that the trial court abused its discretion and, accordingly, reverse termination of Father's parental rights under Section 2511(a)(1). **See id.** at 358.

## Section 2511(a)(2)

Father argues with respect to Section 2511(a)(2) that during his incarceration he worked to fulfill his parental duties toward Child, but "could not visit with [Child] unless [Agency] agreed and the custodian of [Child] brought [Child] to the prison to see him, which . . . did not happen[;]" and that he did attempt to "keep contact with [Child]" but "was denied his right to exercise his parental duty while incarcerated by [Agency preventing] video visitation by the custodial family." **See** Father's Brief at 16-17. Therefore, Father argues, "any lack of contact with [Child] was the result of the [trial court and/or Agency] denials and not any conscious actions by [] Father." **Id.** at 16. Further, Father has "no history of abuse" and is "ready, willing and able to care for [Child]." **Id.** at 18.

Agency responds that Father demonstrated a "patterned course of conduct that displayed his lack of commitment to being an available caregiver for Child." **See** Agency's Brief at 16. Agency does not address in its brief Father's testimony that he had weekly video visits with Child until February 2024, or how this regular recurring contact factors into the evaluation of whether Father maintained a parental relationship with Child. Agency also does not address that Agency itself treated Mother as having recovered from her addiction to methamphetamines to the point of closing Mother's case based on Mother's progress, the same position that Father established at the TPR hearing.

The Adoption Act further provides for termination of parental rights on the basis that:

> The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

Instead of a focus on parental abandonment as in Section 2511(a)(1), in deciding whether a petitioner has established grounds under Section 2511(a)(2), a trial court must be mindful of "the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being." **In re E.A.P.**, 944 A.2d 79, 82 (Pa. Super. 2008) (citation and quotation marks omitted).

Thus, while "sincere efforts to perform parental duties," can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities."

*In re Z.P.*, 994 A.2d 1108, 1117-18 (Pa. Super. 2010) (citations omitted and formatting altered). Relevantly, while a trial court is not required to consider a child welfare agency's reasonable efforts to provide reunification services to a parent prior to termination of rights,

the provision or absence of reasonable efforts [to provide reunification services] may be relevant to a court's consideration of [] the grounds for termination [in Section 2511(a)(2)] and the best interests of the child. [*In re Adoption of*] *S.E.G.*, 901 A.2d [1017, 1029 (Pa. 2006)]. . . . [A]n agency's lack of assistance to a parent [may be] relevant to whether a parent's incapacity cannot or will not be remedied by the parent. 23 Pa.C.S. § 2511(a)(2). . . . **[A] child welfare agency cannot refuse reasonable efforts to an incarcerated parent and then point to the resulting erosion in the parental bond created by the agency as justification for termination of parental rights.** The fact that such a scenario can be articulated, however, does not transform the provision of reasonable efforts to reunite parents and children into a requirement for termination.

*D.C.D.*, 105 A.3d at 672 (emphasis added).

Perhaps most pertinently, in *S.P.* our Supreme Court, after analyzing how incarceration impacts the question of parental abandonment under Section 2511(a)(1), concluded that a different query should be employed to determine parental incapacity under Section 2511(a)(2). *Adoption of S.P.*, 47 A.3d at 822, 827. Reversing a panel of this Court which held that termination was improper for "an [incarcerated] parent who utilizes all prison

resources but remains incapable of parenting a child[,]" the **S.P.** concluded that

> incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under [Section] 2511(a)(2)[,] where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.
>
> *      *      *
>
> [Further,] incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and "the length of the remaining confinement can be considered as highly relevant to whether the conditions and causes of the incapacity . . . cannot or will not be remedied by the parent, sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2).

*Id.* at 828-830 (citation omitted and some formatting altered). Applying this query, our Supreme Court held that the **S.P.** trial court was within its discretion – given that the parent had been incarcerated prior to the child's birth and accordingly never provided the child with "essential parental care[,]" that the parent's parole date was uncertain, and that upon parole the parent would still need "to obtain housing, employment and transportation in addition to parenting skills[]" – to conclude that the petitioner had established grounds for termination pursuant to Section 2511(a)(2). *Id.* at 831.

Here, as stated above, the trial court concluded that Father had been passive in making progress towards reunification with Child by waiting until his release from incarceration to access services, that he had made minimal

efforts to communicate with Child, and that Father's plans for his post-release work and living arrangements were aspirational rather than definite. ***See*** Trial Ct. Op. at 14, 19-21.

Additionally, the trial court stated:

Father simply does not have the current ability to be a caregiver, even if released from prison.

\*     \*     \*

Although Father gives lip service to his apparent care for [] Child, Father is not entitled to preserve his parental rights until he is released from prison. . . .  Further, Father has not provided evidence of his guaranteed release [ ] in December [2024].

***Id.*** at 17-18.  Regarding the trial court's conclusions as to Father's conduct with respect to obtaining services and maintaining contact with Child, we apply the same analysis from our review of Section 2511(a)(1) to this analysis of Section 2511(a)(2).

The trial court also discredited Father's testimony that he was unaware of Mother's drug use when he "made the choice to parent with [Mother]" because "Mother admitted to methamphetamine use while [] Child was in her care." ***Id.*** at 22.  The trial court makes this credibility finding against Father by concluding that "Father was present at the February 25, 2022 FGDM conference where Mother admitted to her methamphetamine use.  Father also testified to his past criminal possession of methamphetamine and using methamphetamine from 2013 to 2017." ***Id.***  As noted above, Father testified that he did not know that Mother continued to use methamphetamine after

Child's birth as Mother hid her drug use. *See* N.T., 9/6/24, at 35-36. The record reflects that Mother used methamphetamine while pregnant, began receiving in-home support services from Agency commencing in December 2021, and that the purpose of the FGDM conference in February 2022 was "to develop a plan of support" for "if Mother would relapse." *See* R.R. at 114a (hearing officer's May 9, 2023 findings of fact, adopted by the trial court on May 13, 2023). Agency was satisfied with Mother's progress to the extent that it closed Mother's case on July 8, 2022. *See id.* Shortly thereafter, on July 19, 2022, Mother admitted to Agency that she had used methamphetamine on July 15, 2022, prompting Agency to re-open Mother's case. *See id.* The record indicates that although Mother admitted to using prior to Child's birth and also on July 15, 2022; there was a period in between these events, including at the FGDM conference, where Mother denied continued drug use; and Agency acted consistent with a belief that Mother was no longer using methamphetamine during this period. *Id.* Agency's evidence is wholly consistent with Father's testimony regarding Mother's drug use.

While free to make credibility findings supported by the record, the trial court's disbelief that Father, with his direct personal experience with using methamphetamine, could not tell that Mother continued her drug use after Child was born, is contradicted by Agency's action in closing Mother's prior case "due to Mother's progress with services and cooperation with the FGDM plan." *See, e.g.*, R.R. at 145a; N.T. 9/6/24, at 44 (Ms. Howard's testimony

that the case had been closed because Mother had been complying with services and the family group plan).[20]  Agency itself determined that Mother was no longer using methamphetamines when it closed Mother's prior case on July 8, 2022, but then learned on July 19, 2022 that Mother continued to use methamphetamine, which is consistent with Father's testimony.  *See* R.R. at 114a (Ex. 6).  The trial court found that Ms. Howard was credible.  *See* Trial Ct. Op. at 14.  The trial court's conclusion that Father knowingly chose to co-parent with an individual who continued to use methamphetamines, a fact-finding that impacts the assessment of Father's judgment and ability to provide a safe environment for Child in the future, is not supported by the record and, accordingly, we need not defer to it.  *See* *Adoption of C.M.*, 255 A.3d at 358 (we "accept the findings of fact and credibility determinations of

---

[20] The trial court also found that Father displayed "an unhealthy contempt towards [] Agency and [its] efforts to protect [] Child."  Trial Ct. Op. at 14.. The record reflects a single incident where Father expressed a negative attitude towards Agency, when Father cursed at Ms. Howard and left the room after she informed him that Agency would be moving to terminate his parental rights to Child.  *See* N.T., 9/6/24, at 51.  We do not condone Father's reaction to that news; however, this is the only instance in the record where Father acted negatively towards Agency.  All of Father's letters to Agency are unfailingly polite and Father never insulted or disparaged Agency or its caseworkers during his testimony.  Father's complaints are about the effect of Agency action on his rights to Child and the discrepancy between the reunification plan set forth in the Dependency Orders and Agency actions. *See* N.T., 9/6/24, at 14, 17-18, 21, 23,-24, 26-28; *see, generally*, R.R. at 140a-43a.  For these reasons, we conclude that the trial court's conclusion that Father displayed an unhealthy contempt towards Agency is not supported by the record.

the trial court if they are supported by the record, but [are] not require[d] to accept the lower court's inferences or conclusions of law" (citation omitted)).

In evaluating Father's capacity to parent Child under Section 2511(a)(2), the length of Father's remaining confinement and how incarceration affects his ability to provide parental care, control or subsistence to Child may be a determinative factor. **See Adoption of S.P.**, 47 A.3d at 830. In **S.P.**, our Supreme Court affirmed the termination of parental rights of a parent who had two to seven years remaining in his term of incarceration, who never provided parental care to his child, and who did not have prospects for housing, employment, or transportation upon his release. **Id.** at 831. Here, in evaluating Father's capacity to provide for Child under Section 2511(a)(2), while Agency was not required to make reasonable efforts to reunify Father with Child to establish grounds for termination, Agency "cannot refuse reasonable efforts [to provide reunification services] to an incarcerated parent and then point to the resulting erosion in the parental bond . . . as justification for termination of parental rights." **See D.C.D.**, 105 A.3d at 672.

Here, Father had been incarcerated four times **prior** to Child's birth and had been incarcerated, for a fifth time, for twenty-five months at the time of the TPR petition hearing. Father's current incarceration was due to a parole violation that occurred when Child was nine months old. As such, the record does not support that Father's conduct **after** Child's birth, consisting of Father's parole violation, that is, a single incident of misconduct,

demonstrates, as Agency argues, "a patterned course of conduct" indicating lack of commitment to caring for Child.

With regard to the length of his incarceration, Father kept Agency promptly informed of his term of sentence and his expected release in December of 2024. Father had an offer of residence from his brother, who had committed to support him in getting back on his feet, and Father has job skills as a certified welder and a job prospect using these skills upon his release. *See* N.T., 9/6/24, at 7, 28-29. Father had cared for Child for the first nine months of Child's life and maintained contact and attempted to maintain a meaningful relationship with Child while incarcerated, despite Agency's hindrance of this goal. We note that, given Child's young age, had Father followed Agency's direction, his contacts and relationship with Child would be even more attenuated than they currently stand.

Pursuant to *S.P.*, our review of the record does not support a conclusion that the length of Father's remaining incarceration, by itself, rendered Father incapable of providing essential care, control or subsistence necessary for Child's physical or mental well-being. *Adoption of S.P.*, 47 A.3d at 828-30. Compared with the parent in *S.P.*, Father had an established caregiving relationship with Child for the first nine months of Child's life and attempted to maintain this relationship from prison and, therefore, has a foundation on which to re-establish a parenting relationship with Child upon his release, and his remaining term of sentence is considerably shorter. Moreover, Father's prospects for establishing a stable home and income upon release are more

concrete than the incarcerated parent in *S.P.,* as Father had identified a residence and potential employment and had job skills.

"Because of the serious impact attending the termination of parental rights, . . . [the trial court's] decree extinguishing [Father's] rights [must] be based solely on competent evidence." *Adoption of C.M.*, 255 A.3d at 358 (citations omitted and formatting altered). The record reflects that Father's capacity to maintain a meaningful relationship with Child was hindered by Agency's own actions in restricting his contact with Child. The Dependency Orders uniformly acknowledged that Father could not access services while incarcerated and provided that Father's progress toward reunification shall commence upon his release. *See, e.g.*, R.R. at 99a-101a (Ex. 5). Father's efforts to access services must be evaluated against these circumstances as the Dependency Orders established a timeline for commencement of Father's progress. Father's incapacity to parent Child while incarcerated is due in part to Agency's lack of reasonable efforts to provide reunification services. *See D.C.D.*, 105 A.3d at 672 (stating that "child welfare agency cannot refuse reasonable efforts to an incarcerated parent and then point to the resulting erosion in the parental bond created by the agency as justification for termination of parental rights"). On this record, we conclude that the trial court failed to consider the provisions in the Dependency Orders that acknowledged Father's lack of access to services while incarcerated, and the effect of Agency's conduct on Father's understanding of when he needed to commence progress on his services and on Father's ability to maintain contact

with Child. The trial court therefore abused its discretion when it gave no practical effect to these key provisions in the Dependency Orders, which directly impacted Father's circumstances and were also communicated to Father by Agency. *See Adoption of C.M.*, 255 A.3d at 358. We therefore conclude that Agency failed to carry its burden of establishing by clear and convincing evidence that Father has a repeated and continued incapacity to parent Child that cannot or will not be remedied. *See* 23 Pa.C.S. § 2511(a)(2); *see also, Adoption of S.P.*, 47 A.3d at 828-30; *see also, T.J.J.M.*, 190 A.3d at 626; *D.C.D.*, 105 A.3d at 676-77.[21] Accordingly, we reverse the trial court's termination of Father's parental rights pursuant to Pa.C.S. § 2511(a)(2).

For these reasons, we vacate the decree terminating Father's parental rights to Child and remand for entry of an order denying the involuntary termination petition.

Decree vacated. Remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.

Judge King joins the opinion.

PJE Stevens concurs in the result.

---

[21] As we reverse the trial court's finding of grounds for termination under 23 Pa.C.S. § 2511(a)(1) and (a)(2) we need not address Child's best interests under Section 2511(b). *See T.J.J.M.*, 190 A.3d at 631 (explaining that where this Court concluded that the trial court abused its discretion in terminating parental rights pursuant to Section 2511(a), this Court "need not consider the decree pursuant to Section 2511(b)" (citation omitted)).

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 05/13/2025